**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LIMA JEVREMOVIC,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **BRITTANY JEREAM COURVILLE**, <br><br> Defendant. | Civil Action No. 22-4969 (ZNQ) (RLS) <br><br> **OPINION** |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendant Brittany Jeream Courville ("Defendant"). ("Motion", ECF No. 20.)[1] Defendant filed a Moving Brief in support of her Motion. ("Moving Br.", ECF No. 20-1.) Plaintiffs Lima Jevremovic ("Lima") and Autonomous User Rehabilitation Agent, LLC ("AURA" or "the Company") (collectively, "Plaintiffs") filed an Opposition to Defendant's Motion ("Opp'n", at 22) to which Defendant replied ("Reply", ECF No. 23.)

    The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Defendant's Motion to Dismiss.

---

[1] Pursuant to the Court's instruction, (ECF No. 24), Defendant renewed its Motion on June 13, 2023 (ECF No. 33).

I.   **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiffs initiated the instant action on August 8, 2022, by filing their Complaint. ("Compl." ECF No. 1.) Although the Complaint alleged that subject matter jurisdiction is proper under 28 U.S.C. § 1332 (Compl. ¶ 5), Plaintiffs failed to adequately allege the citizenship of the plaintiff limited liability company, AURA. Accordingly, on May 30, 2022, the Court issued an Order to Show Cause why this matter should not be dismissed for lack of subject matter jurisdiction. (ECF No. 24.) On June 6, 2023, Plaintiffs filed an Amended Complaint ("Am. Compl.", ECF No. 26) that adequately alleged AURA's citizenship. Accordingly, the Court withdrew its Order to Show Cause. (ECF No. 32.)

The Amended Complaint generally alleges defamation in the form of libel in connection with Defendant's publications and republications to the Internet of or about Plaintiffs.[2] (*Id.* ¶ 4.) Specifically, it alleges that Defendant is a New Jersey attorney that was licensed in 2021. (*Id.* ¶ 7.) In 2019, Lima founded AURA to help individuals suffering through mental health crises—including addiction—using technology to scale affordable, high quality mental health treatment services. (*Id.* ¶ 10.) AURA also produces vitamins/supplements for brain health and mood support. (*Id.*) AURA developed a community of adherents, and it has succeeded in garnering an initial round of investor funding for its development and launch. (*Id.* ¶ 11.) Through AURA, Lima "supplies mental health assistance tools to numerous individuals free of charge in order to receive feedback, refine her tools, and develop a viral, word-of-mouth buzz surrounding the product." (*Id.*) To that end, AURA additionally provides services without charge to celebrities, influencers, and persons in the public eye as well as individuals with no public presence as a community social

---

[2] For purposes of this motion, the Court will accept all facts alleged in the Complaint as true. *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992).

service. (*Id.*) Plaintiffs were successful in this regard until Defendant began her social media campaign against them. (*Id.*)

One such recipient of AURA's free-of-charge services was Amanda Rabb ("Rabb"), an unhoused, drug-addicted woman residing in Los Angeles who turned to sex work to fund her addiction. (*Id.* ¶ 12.) AURA provided $250,000 to be used by Rabb for her rehabilitation to gradually integrate Rabb back into society. (*Id.*) Rabb was also given the opportunity to use AURA's products at no cost in conjunction with her treatment and therapy under the supervision of health care professionals. (*Id.*) Lima personally funded the majority of Rabb's treatment, including drawing $212,500 from a personal line of credit, supplemented by $37,241 in donated funds. (*Id.*) On Sunday, May 9, 2021, staff at the Desert Hope Treatment Center ("Desert Hope") found Rabb unresponsive in her bed and unsuccessfully performed CPR. (*Id.* ¶ 13.) Desert Hope indicated that Rabb only had Tylenol in her system, which was later verified by a representative of the Clark County Coroner, Dr. Paul Uribe ("Dr. Uribe"). (*Id.*) Dr. Uribe added that Rabb's death resulted from natural causes, as well as physical trauma previously endured while abusing illicit substances. (*Id.*) Rabb's formal autopsy report states that she died from cardiac arrhythmia with hypertension, obesity, and schizophrenia as contributing factors. (*Id.*)

Celebrity entertainer Brandon "Bam" Margera ("Margera") and his wife, Nicole Boyd-Margera ("Boyd-Margera"), took an interest in AURA in the Spring of 2021 and sought to provide their support to Plaintiffs' cause until Margera relapsed in his battle against substance abuse. (*Id.* ¶ 14.) On or about June 7, 2021, an Arizona court imposed a one-year temporary guardianship over Margera in connection with his diagnosed mental disorder. (*Id.* ¶ 15.) Lima took on the responsibility for Margera's care and treatment, effected by court order and agreed to do so free of charge. (*Id.*) During this time, Lima was given no control over or insight into Margera's

3

finances.  (*Id.*)  Margera began treatment at a drug rehabilitation facility in Florida but left this facility thereafter, with his whereabouts unknown for several weeks while he engaged in risky and self-destructive behaviors consistent with his mental disorder.  (*Id.* ¶ 16.)  "Margera was found and involuntarily placed in the custody of another drug rehabilitation facility."  (*Id.*)  After the court ordered guardianship terminated, Margera requested that Lima continue to serve as his "Health Care Agent," a role in which she assists Margera with his medical care related to his mental health treatment and recovery.  (*Id.*)

Margera's guardianship and substance abuse treatment received press coverage.  (*Id.* ¶ 17.) Defendant pried into Margera's public records, discovered Lima's involvement, and formulated a conspiracy theory.  (*Id.*)  Defendant began publishing videos, photos, and text commentary regarding Margera, labeling her publications "#FreeBam," a reference to Margera's stage name, "Bam", and included a biography on her Instagram account, calling herself a "conspiracy theorist." (*Id.*)  Defendant's theory is that Margera's family, friends, and business partners used a court-imposed guardianship to remove Margera as an obstacle to co-opting his assets.  (*Id.* ¶ 18.) Defendant further asserts that Lima is committing and assisting in the commission of criminal acts and that Lima is dishonest and promulgates lies.  (*Id.*)  "In formulating conspiracies about [Lima], [Defendant] further latched onto the publicity surrounding Rabb, her treatment, and her ultimate death."  (*Id.*)  Defendant "published videos, photos, and textual commentary in which she falsely accused [Lima] of criminal acts and dishonesty" and inspired a throng of similarly celebrity-obsessed fans to harass, threaten, and attack Lima, her family, and her business.  (*Id.*)  Defendant's statement also directly interfered with AURA's second round funding, causing potential investors actively involved in funding discussions to retreat and interfered with AURA's launch of a new

4

product line of vitamin supplements, directly resulting in order cancellations and the withdrawal of marketing affiliates.  (*Id.* ¶ 20.)

Defendant knew and ignored the fact that no evidence demonstrated Lima was dishonest or a criminal.  (*Id.* ¶ 22.)  Defendant was aware that her statements of fact were untrue based on their inherent improbability and took steps to deliberately avoid learning the truth regarding Lima, despite that such information was available to her.  (*Id.* ¶¶ 24–25.)  Defendant's videos air advertisements from which she personally profits thus incentivizing her to publish and disseminate shocking materials, materials regarding celebrities, and other materials designed to maximize the views received by the commercials that play during her videos.  (*Id.* ¶ 26.)  Defendant further solicits and collects donations directly from viewers during her live broadcasts via YouTube and operates gofundme and Patreon sites on which she accepts donations.  (*Id.* ¶ 27.)  Defendant also uses her social media accounts to drive income through the sale of branded merchandise.  (*Id.*)  On July 15, 2022, Plaintiffs contacted Defendant in writing to demand retraction of defamatory statements.  (*Id.* ¶ 28.)  To the extent Defendant disclaimed any of her defamation, her attempts were patently pretextual and insincere.  (*Id.*)  On July 22, 2022, Plaintiffs again contacted Defendant in writing to identify further defamatory statements and to demand their retraction, but no retraction was issued.

**II.      JURISDICTION**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.

### III.     LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability

6

requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (quotations and brackets omitted).

## IV.     DISCUSSION

### A.     LIBEL AGAINST LIMA

In Count I of the Complaint, Lima alleges a libel claim against Defendant. Lima lists multiple statements made by Defendant that she alleges are defamatory. Specifically, Lima alleges that on May 30, 2022, Defendant published via Instagram a statement that noted: "Lima . . . LIED ABOUT [RABB'S] CAUSE OF DEATH TO MILLIONS of people." (Compl. ¶ 30.) On April 19, 2022, Defendant published an image of Lima reading Rabb's cause of death from a YouTube video to Instagram with the caption: "I requested the autopsy report and lima is lying in this video. There was NO evidence of traumatic injury. There was LOTS [sic] of medication in her system (not 'only Tylenol'). The cause of death has nothing to do with 'seizure disorder', but rather cardiac arrhythmia. I've posted on [Instagram] about it." (*Id.* ¶ 32.) On April 19, 2022, Defendant published photos of Rabb's "Report of Investigation" record obtained from the Clark County Coroner, and stated: "Two of Lima's lies EXPOSED: (EXCLUSIVE AUTOPSY REPORT) 1.

7

WAYY [sic] more than just Tylenol in her system (including cannibinoids and barbiturates) 2. Cause of death is NOT 'seizure disorder' or 'caused by beatings and rap[e]s) [sic], but rather, 'cardiac arrhythmia'. #AmandaRabb #FreeBam #LIARS." (*Id.* ¶ 34.) On April 19, 2022, Defendant published a video of Lima reading Rabb's cause of death from a YouTube video to Instagram, and stated: "So lima from @meetaura BOLD FACE LIED to [Mr. Laita] and [YouTube] followers when she said Amanda Rabb's cause of death was 'seizure disorder'. I have reached out twice to [Mr. Laita] for comment, and he has ignored me. Why did lima lie??" (*Id.* ¶ 36.)

On March 30, 2022, Defendant published to Instagram an excerpt of a YouTube video in which Lima and Larry Rabb, Rabb's father, describe how they managed to transfer Rabb from jail to a drug rehabilitation facility through the use of Court Ordered Treatment under California law at which point Defendant states that Rabb's public defender is not supposed to "help you push your scam conservatorship through." (*Id.* ¶ 41.) On April 3, 2022, Defendant published an image on Instagram which purports to list biographical information about Margera, including his putative net worth ($20 Million) and commented: "According to @distractify, [Margera] is worth $20 million. Now who would have an incentive to want to control that money and who would be in a position to do so . . .but what do I know I'm just a cOnSpIrAcY tHeOrIsT." (*Id.* ¶ 38.) On April 27, 2022, Defendant published on Instagram an image showing a digital message sent to her in which Defendant is criticized for spreading falsehoods (i.e., "Irresponsible videos with imagined facts can be very damaging to others"), captioning the image "SUE ME" and further commenting "the only facts that were imagined came from Lima Jevremović's [sic] lying ass mouth." (*Id.* ¶ 52.) On April 27, 2022, Defendant published on Instagram another image showing a portion of the message sent to her commented "or is it maybe because the public record doesn't agree with

the fake[,] imaginary tale surrounding Rabb's death that [the message sender] wants us to believe??" (*Id.* ¶ 55.)

Similar posts and comments were posted during this time. On April 26, 2022, Defendant published to Instagram a screenshot showing the "gofundme" donation page for Rabb's treatment, which then indicated that no new donations would be accepted and commented "thanks for taking down your fraudulent fundraiser lima!" (*Id.* ¶ 58.) Lima also alleges that Defendant accused her of fraud (*id.* ¶ 63), implied that Margera was being trafficked (*id.* ¶ 66), and claims that "Lima" is an "alleged trafficker" (*id.* ¶ 70). On April 3, 2022, Defendant posted a screenshot of an excerpt of a celebrity tabloid article to Instagram, in which she highlighted a portion of the title stating, "Margera Used To Have A $45 Million New Worth" and Defendant commented "I heard forced rehab is expensive… I learned that from Lima from @meetaura. Who now has @bam__margera in a forced rehab. WhT [sic] are the chances!! That's just my conspiracy theory lol." (*Id.* ¶ 74.) On March 30, 2022, Defendant responded to a comment that asked, "forced incarceration, experimenting on homeless & celebrity cash cows to fund her treatment centers?" by stating "I mean… that's my impression, so if you're wrong[,] I am too." (*Id.* ¶ 76.) On April 4, 2022, Defendant published to YouTube a video in which she describes Margera's transfers between treatment facilities and states: "honestly, some of it looks criminal. Now I'm a lawyer, but what do I know. It looks criminal to me." (*Id.* ¶ 78.) On May 4, 2022, Defendant published an image to Instagram containing mostly text; the text is a republication of a comment previously made by Defendant, which of relevance includes: "I am a licensed attorney who believes [Margera]'s constitutional rights have been violated. Based on my education, knowledge, and experience, he has been set up by a group of criminal co-conspirators for financial purposes not in [Margera's] best interest." (*Id.* ¶ 47.) Lastly, on May 7, 2022, Defendant published a photo to Instagram

9

picturing Margera's costars from his television show and movies performing a stunt, and Defendant captioned the photo "[PEOPLE] . . . are mad that I'm uncovering a criminal conspiracy." (*Id.* ¶ 43.) Plaintiffs therefore allege that these statements are defamatory because they imply that Lima is liar, she was financially motivated to force treatment, and was involved in criminal activity such as fraud. (*Id.* ¶¶ 30–85.) Defendant, on the other hand, argues that these statements are not actionable because they are protected opinions rather than defamatory statements. (Moving Br. at 8.)

Whether a statement is defamatory is a matter of law to be determined by the court. *Higgins v. Pascack Valley Hosp.*, 158 N.J. 404, 426 (1999).[3] To establish a prima facie case of defamation, whether denominated libel or slander, a plaintiff must show that defendant communicated a false statement about plaintiff to a third person that harms plaintiff's reputation in the eyes of the community or deters third persons from associating with the plaintiff. *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 164–65 (1999). Plaintiffs' burden of proof for each of the elements of defamation is by clear and convincing evidence. *Rocci v. Ecole Secondaire Macdonald-Cartier*, 165 N.J. 149, 159 (2000); *Lynch* 161 N.J. at 165. A defamatory statement is one that "harms the reputation of another such that it lowers the defamed person in the estimation of the community or deters third parties from dealing with that person." *Salzano v. N. Jersey Media Grp. Inc.*, 201 N.J. 500, 512 (2010). "To determine if a statement has a defamatory meaning, a court must consider three factors: '(1) the content, (2) the verifiability, and (3) the context of the challenged statement.'" *Id*. (quoting *DeAngelis v. Hill*, 180 N.J. 1, 14 (2004)).

In considering verifiability, New Jersey courts have drawn a line between opinions, which are not actionable, and statements of fact, which are. "A statement's verifiability refers to whether

---

[3] Federal courts apply state substantive law when sitting pursuant to diversity jurisdiction. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

10

it can be proved true or false." *Lynch*, 161 N.J. at 167. A statement is actionable if it "'suggested specific factual assertions that could be proven true or false.'" *Leang*, 198 N.J. at 585 (quoting *DeAngelis*, 180 N.J. at 14). Statements of opinion are usually not actionable, as opinions "'are generally not capable of proof of truth or falsity because they reflect a person's state of mind[.]'" *NuWave Inv. Corp. v. Hyman Beck & Co.*, 432 N.J. Super. 539, 553 (App. Div. 2013) (quoting *Ward*, 136 N.J. at 531), *aff'd*, 221 N.J. 495 (2015). But an opinion is actionable if "it implies 'reasonably specific assertions' of 'underlying objective facts that are false.'" *Id.* (quoting *Ward*, 136 N.J. at 531).

"Loose, figurative or hyperbolic language is not likely to imply specific facts" and thus is generally not actionable. *Lynch*, 161 N.J. at 167–68. Similarly, "epithets, insults, name-calling, profanity and hyperbole" are not actionable. *DeAngelis*, 180 N.J. at 14. "The higher the fact content of a statement," the more likely it is actionable. *Lynch*, 161 N.J. at 168 (internal quotation marks and citation omitted).

Statements "falsely attributing criminality to an individual [are] defamatory as a matter of law." *G.D. v. Kenny*, 205 N.J. 275, 293 (2011) (internal citation omitted) (flyers referring to the plaintiff as a convicted drug dealer were defamatory); *see also Lawrence v. Bauer Publ'g & Printing*, 89 N.J. 451, 456, 459–60 (statement that two men might be charged with forgery was defamatory), *cert. denied*, 459 U.S. 999 (1982). "Yet, this does not mean that using a word that is also the name of a crime necessarily accuses the person of committing that crime." *Roberts v. Mintz*, Civ. No. 1563-14T4, 2016 WL 3981128, at *6 (N.J. Super. Ct. App. Div. July 26, 2016). Rather, the word must be considered in context, focusing on "the listener's reasonable interpretation" of the statement. *Leang*, 198 N.J. at 585. Context includes "the identity of the speaker and the targeted audience[,]" *Senna v. Florimont*, 196 N.J. 469, 492–93 (2008), or "the

section of a newspaper in which an article appears" *Lynch*, 161 N.J. at 168 (internal citation omitted).

Here, context is critical in deciphering unactionable opinion versus defamatory speech. Defendant's statements were delivered by a social media influencer on Instagram, and occasionally, YouTube. These are forums that welcome opinions and candor. *See, e.g.*, *Sciore v. Phung*, Civ. No. 19-13775, 2022 WL 950261, at *11–12 (Mar. 30, 2022) (holding that "statements made on internet forums are made in a unique context in that they are generally informal and unedited. This context leads readers to give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts" and further noted that since the defendant's allegedly defamatory statements were made on "an Internet forum specifically designed for the publication of crowd-sourced opinionated" statements, this "conveys a strong signal to a reasonable reader that the statements are defendant's opinion…the allegedly defamatory statements here do not overcome that context and are not actionable.") (quotations and citations omitted); *see also Valley Elecs. AG v. Polis*, Civ. No. 21-2108, 2022 WL 893674, at *2 (2d Cir. Mar. 28, 2022) (finding as relevant context for affirming dismissal of defamation claim as protected opinion, fact that statements were made in Instagram comments because they "used media that are typically regarded by the public as . . . vehicles for the expression of individual opinion rather than the rigorous and comprehensive presentation of factual matter") (quotations and citation omitted); *Pelkowski v. Hovermann*, Civ. No. 20-1845, 2021 WL 9032222, at *5 (E.D.N.Y. Sept. 9, 2021) ("The defamatory statements [plaintiff] claims defendants made first appeared on the widely popular social media website Instagram, a context which weighs in favor of a finding that the statements were opinion. Numerous New York courts have expressed that communication appearing on social media and other internet websites are distinct from that which

appears in print media such as newspapers and magazines" noting that the suggestion of opinion "is further bolstered by the fact that it appears in a social media post featuring a string of hashtags, colorful emojis, and snarky writing"); *Rapaport v. Barstool Sports, Inc.*, Civ. No. 18-8783, 2021 WL 1178240, at *12 (S.D.N.Y. Mar. 29, 2021) ("apparent statements of fact may assume the character of statements of opinion . . . where comments are made on free-wheeling internet fora, such as blogs or social media sites, which courts have generally found to be a persuasive factor in holding that a statement would be understood by readers as reflecting the author's opinion.").

In satirical spirit, Defendant can be seen wearing either panda ears or bunny ears while making her statements, while a sparkly unicorn piñata rests prominently in the background. Additionally Defendant's profile picture is a photograph of her wearing a pink fuzzy ear headband and tie-dye shirt, and includes in her Instagram biography that she is a "Legal Edutainer (not legal advice)". (Compl. ¶ 84.) *See Roberts*, 2016 WL 3981128, at *6 (dismissing defamation claim because "defendant made the[ defamatory] statements under the heading, 'Rants and Raves,' signaling to any reader that what followed were the author's personal viewpoints.") Defendant frequently uses hashtags and emojis in her writing (*id.* ¶¶ 34–74) and although Plaintiffs argue that Defendant holds herself out as a legal expert, Defendant disclaims that her opinions are "not legal advice." *See, e.g., Perez*, 2013 WL 5770734, at *5.

Moreover, the specific language used in the context of the allegedly defamatory statements signals that Defendant is merely expressing her opinions and theories. Defendant repeatedly refers to her opinions—including the relationship between Lima and Margera—as mere "theories." (Compl. ¶¶ 38–39, 43, 45, 74.) Indeed, Defendant continually characterizes herself as a "conspiracy theorist," (*id.* ¶¶ 17, 38–39, 43, 45) and attaches disclaimers to her self-proclaimed theories making clear they are her beliefs. (*See, e.g., id.* ¶ 38 ("what do I know I'm just a conspiracy

theorist"); *id*. ¶ 45 ("I AM a conspiracy theorist. I have a theory that this is a criminal conspiracy."); *id*. ¶ 47 ("I…believe[] [Margera]'s constitutional rights have been violated."); *id*. ¶¶ 50–51 (according to Plaintiffs' allegations, adopting statement that "I personally believe conservatorships are never the answer and forced treatment is harmful"); *id*. ¶ 74 (referring to Margera's court-ordered involuntary rehabilitation as "a forced rehab" and stating that such characterization is "just my conspiracy theory."); *id*. ¶ 76 (responding to Instagram commentator's theories regarding forced treatment, and stating, "I mean…that's my impression."); *id*. ¶ 78 (referring to theory regarding forced treatment, and stating, "some of it looks criminal . . . but what do I know. It looks criminal to me.")). Plaintiffs' allegations similarly acknowledge Defendant making clear that when she refers to her theories, she is consistently referring to "my opinion or my belief or my suspicion" (*id*. ¶ 84), "my impression" (*id*. ¶ 76), "my [] theory" (*id*. ¶¶ 45, 74), what "I [] believe[]" (*id*. ¶¶ 47, 49) or what was "alleged." (*Id*. ¶ 70.)

The Third Circuit has held that "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *McCafferty v. Newsweek Media Grp., Ltd.,* 955 F.3d 352, 356 (3d Cir. 2020) (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)). In *McCafferty*, our appellate court found that the defendant's alleged defamatory statements were not actionable because they were disclaimed as the defendant's "political philosophy." Similarly here, Defendant frequently disclaims her commentary as a conspiracy *theory*, refers to herself as a conspiracy *theorist*, uses signals such as "I believe" and "I think", and makes commentary on her social media page which is titled "Legal Edutainer", all of which point to unactionable opinions rather than defamatory statements. Accordingly, the Court will dismiss Count I without prejudice.

B.  **LIBEL AGAINST AURA**

In Count II of the Complaint, Plaintiff AURA alleges a libel claim against Defendant. Specifically, Plaintiffs allege that Defendant questioned Lima's ability to uphold Health Insurance Portability and Accountability Act ("HIPAA") privacy (Compl. ¶ 91), commented that "[she] think[s] . . . [Rabb] never had seizures prior to using AURA" (*id.* ¶ 95), and that "Rabb was forced to [undergo AURA's] treatment under the threat of going to prison" (*id.* ¶ 97). On April 1, 2022, Lima published an excerpt from a program for a virtual reality conference which included Lima and her then-company, which worked with virtual reality in jail and prison settings and commented that it "seems like Lima has BEEN looking for a way to use experimental virtual reality apps on vulnerable populations that she views as 'problematic.'" (*Id.* ¶ 99.) On March 30, 2022, Defendant expressed that "Rabb did not consent to being used as a research object. She was court ordered into a conservatorship after Lima, mark Laita, and Rabb's dad SET HER UP. This same woman petitioned to put Bam into a conservatorship." (*Id.* ¶ 101.) Lastly, Defendant stated on a Youtube vide that "[Lima] forces people by court order to use [AURA's] tool." (*Id.* ¶ 103.) Plaintiffs argue that these statements and comments are defamatory because it implies Lima violates the HIPAA laws, AURA's products caused Rabb's seizures, patients were preyed upon and forced into AURA against their will, and AURA imposes conservatorships on people as a means to force people to use AURA's tools. (*Id.* ¶¶ 92, 96, 98, 100, 104.)

In her Motion, Defendant argues that these statements, to the extent that they are true, are not defamatory. (Moving Br. at 20.) For example, "the Complaint readily alleges that AURA provides these tools to individuals such as Ms. Rabb 'free of charge' to 'develop a viral, word-of-mouth buzz surrounding the product.'" (*Id.* (quoting Compl. ¶ 11.)) Defendant also argues that "Plaintiffs therefore do not dispute that AURA was allowing Rabb the use of this treatment, which

15

was only in its initial round of funding as a marketing tool on their Internet presence. (*Id.* (citing Compl. ¶¶ 93, 97.) Lastly, Defendant argues that the majority of the alleged defamatory statements were not "of and concerning" Plaintiffs, and are therefore unactionable. (*Id.* at 20.)

Defendant is correct in pointing out that truthful statements of facts are not defamatory. *See Higgins v. Pascack Valley Hospital*, 158 N.J. 404, 427 (1999) (holding that statements regarding an investigation of an employee were not defamatory because they did not attack her reputation, but only stated the facts). Thus, to the extent that any of these statements are true, they are not actionable. However, the veracity of Defendant's statements is not something for the Court to decide at this stage in the litigation. Count II nonetheless fails to state a claim for the same reasons as Count I. Namely, Defendant's statements, as pled, evince Defendant's opinions rather than defamatory statements. Defendant was making these statements on an account titled "Legal Edutainer" and most importantly, Defendant signals that these statements are her opinion by using words such as "I think" and "it seems." *See McCafferty,* 955 F.3d at 356 ("[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."). Accordingly, Count II will also be dismissed without prejudice.

### C. ACTUAL MALICE

Plaintiffs' claims further fail because they did not sufficiently plead actual malice. To show defamation, a public figure—even if just a "limited-purpose public figure" like Plaintiffs—must show that the publisher acted with "actual malice." *McCafferty,* 955 F.3d at 359 (citing *American Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007). The Court agrees with the parties that the actual malice standard applies as Plaintiffs are limited-purpose public figures as they injected themselves into the public sphere by soliciting media

16

attention via an intensive public relations campaign regarding their rehabilitation treatment and treating high profile celebrities such as Margera.[4] (*Id.* ¶¶ 11, 14.) "Actual malice" is a term of art that does not connote ill will or improper motivation. Rather, it requires that the publisher either know that its article was false or publish it with "reckless disregard" for its truth. *McCafferty,* 955 F.3d at 359. The First Amendment requires this demanding standard. *Id.* (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Accordingly, Plaintiffs must plead actual malice.

Defendant does not admit that she "serious[ly] doubt[ed]" the truth of her statements or knew that they likely contained false statements. *Id.* (citing Restatement (Second) of Torts, § 580A cmt. d (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968))). "Thus, to show actual malice, [Plaintiffs] must use circumstantial evidence." *Id.* (citing *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 437 (Pa. 2015)). Critically, it is not enough for purposes of actual malice to plead that a defendant published statements "without fact-checking, without investigation, without interviewing those involved, and with no regard for accuracy." *Lee v. TMZ Prods. Inc.*, 710 F. App'x 551, 560 (3d Cir. 2017). It is equally inadequate to allege that a defendant had bad motives or "ill will" towards plaintiff. *Jorjani v. New Jersey Inst. of Tech.*, Civ. No. 18-11693, 2019 WL 1125594, at *4 (D.N.J. Mar. 11, 2019). Nor can a plaintiff rely on "a bare conclusory assertion that [a defendant] 'knew and/or reasonably should have known that the statement was false.'" *Darakjian v. Hanna*, 366 N.J. Super. 238, 248 (App. Div. 2004). Instead, Plaintiffs need to plead sufficient facts to plausibly allege that Defendant "actually doubted the veracity" of her statements." *Lee*, 710 F. App'x at 560. In other words, the complaint must "allege sufficient particularized facts to suggest that . . . [the statement] was published with knowledge of its falsity or a reckless disregard for the truth or falsity of the reported statement." *Darakjian*, 366 N.J.

---

[4] Plaintiffs even reserve a section of their Complaint for pleading actual malice. (Compl. ¶¶ 22–28.)

17

Super. at 248. This high bar is purposeful as the actual malice standard reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co.*, 376 U.S. at 270; *see also Darakjian*, 366 N.J. Super. at 248 ("To permit a defamation action [regarding matters of public concern] to survive on the basis of a mere allegation of knowledge of falsity or reckless disregard affords insufficient breathing space to the critical rights protected, in the public interest, by the First Amendment.").

Plaintiffs claim that Defendant acted with actual malice because she ignored evidence that demonstrated Lima's honesty and clean criminal background, had a preconceived storyline, was aware that her statements were untrue, and took steps to deliberately avoid learning the truth regarding Lima. (Compl. ¶¶ 22–25.) These statements are bare and conclusory, and New Jersey courts have consistently dismissed defamation cases where the plaintiff only made bare conclusory allegations regarding actual malice. *See Darakjian*, 366 N.J. Super. at 246 (reversing lower court and dismissing defamation claim for failure to plead actual malice where "plaintiff has pled no facts tending to support her assertion that the offending article was published with an awareness that the statements reported were false" where plaintiff alleged only "a bare conclusory assertion that the press defendants 'knew and/or reasonably should have known that the statement…was false,' with no other factual reference to lend support to the contention," this is insufficient to sustain a claim of actual malice); *Jorjani*, 2019 WL 1125594, at *5 (same); *see also Pace v. Baker-White*, 850 F. App'x 827, 832 (3d Cir. 2021) ("conclusory allegations are insufficient" to establish actual malice at the pleading stage, such as allegations that defendant "had knowledge of, or acted in reckless disregard as to the falsity of the matter they communicated." Rather, "[a]t the pleading

18

stage, a public figure, like [plaintiff] must allege *facts* to support an inference of actual malice.") (emphasis in original).

"The actual malice standard is not satisfied by proof of even 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 498 (E.D. Pa. 2018) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989)). Rather, "'actual malice' requires that 'the defendant in fact entertained serious doubts as to the truth of his publication.'" *Id*. (quoting *St. Amant*, 390 U.S. at 731). Plaintiffs do not point to any facts—circumstantial or direct—that demonstrates Defendant entertained any serious doubts about the veracity of the statements she made. *See Nothstein v. United States Cycling*, 499 F. Supp. 3d 101, 126 (E.D. Pa. 2020). Even if Defendant did not do enough to substantiate the statements prior to making them on social media, she is not liable for defamation because "mere proof of failure to investigate, without more, cannot establish" such serious doubts as to the truth of the publication. *Id*. (citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 332 (1972)). "Actual malice focuses on [Defendant's] attitude towards the *truth*," not towards the plaintiffs themselves. *McCafferty,* 955 F.3d at 360 (citing *DeMary v. Latrobe Printing & Publ'g Co*., 762 A.2d 758, 764 (Pa. Super. Ct. 2000)) (emphasis in original). In sum, Plaintiffs do not plead facts that suggest actual malice. Accordingly, the Court will grant Defendant's Motion to Dismiss.

V.  **CONCLUSION**

For the reasons stated above, the Court will GRANT Defendant's Motion to Dismiss. Plaintiffs will be given thirty (30) days to file a Second Amended Complaint. Failure to cure the defects noted in this Opinion may lead to dismissal with prejudice. An appropriate Order will follow.

Date: **August 10, 2023**

_s/ Zahid N. Quraishi_
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
