### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIMA JEVREMOVIĆ, an individual; and AUTONOMOUS USER REHABILITATION AGENT, LLC, a Delaware Limited Liability Company, <br><br> Plaintiffs, <br><br> vs. <br><br> BRITTANY JEREAM COURVILLE, an individual; and THAT SURPRISE WITNESS TV LLC, a New Jersey Limited Liability Company, <br><br> Defendants. | Civil Action No: 3:22-cv-04969-ZNQ-RLS <br><br> Return Date: March 3, 2025 <br><br> Oral Argument Requested <br><br> Document Electronically Filed |

---

**PLAINTIFFS', LIMA JEVREMOVIĆ AND AUTONOMOUS USER REHABILITATION AGENT, LLC, MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT**

---

Elliot D. Ostrove, Esq. (Bar No. 025581997)
EPSTEIN OSTROVE, LLC
200 Metroplex Drive, Suite 304
Edison, New Jersey 08817
Telephone: (732) 828-8600
Email: e.ostrove@epsteinostrove.com

*Attorneys for* Plaintiffs Lima Jevremović and Autonomous User Rehabilitation Agent, LLC

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ................................................................................ 1

II. STATEMENTS OF FACTS ................................................................................... 3

   A.  PLAINTIFFS' INVOLVEMENT WITH BAM MARGERA ......................... 3

   B.  PLAINTIFFS' INVOLVEMENT WITH AMANDA RABB ......................... 7

III. LEGAL STANDARD ........................................................................................ 10

IV. LEGAL ARGUMENT ........................................................................................ 10

   A.  PLAINTIFFS HAVE ADEQUATELY PLEAD CLAIMS FOR DEFAMATION .......... 10

      1. The First Prong: Defendants Published False and Defamatory Statements Concerning Plaintiffs .............................................................................. 11

         a)  Defendants Published False and Defamatory Statements Regarding Plaintiffs' Involvement with Mr. Margera ............................................. 12

         b)  Defendants Published False and Defamatory Statements Regarding Plaintiffs' Involvement with Ms. Rabb ................................................. 15

         c)  Defendants Published False and Defamatory Statements by Implying That Ms. Jevremović Had an OnlyFans Account ................................ 17

      2. The Second Prong: Defendants Published Defamatory Statements to Their Audience .......................................................................................... 18

      3. The Third Prong: Plaintiffs Adequately Pled Actual Malice ....................... 19

   B.  PLAINTIFFS HAVE ADEQUATELY PLED INTRUSION UPON SECLUSION ........ 24

   C.  PLAINTIFFS HAVE ADEQUATELY PLED FALSE LIGHT ..................... 25

   D.  PLAINTIFFS HAVE ADEQUATELY PLED EMOTIONAL DISTRESS CLAIMS ..... 26

   E.  PLAINTIFFS HAVE ADEQUATELY PLED TORTIOUS INTERFERENCE CLAIMS .............................................................................................. 28

   F.  PLAINTIFFS SHOULD BE AFFORDED AN OPPORTUNITY TO AMEND. ........... 29

V.  CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acevedo v. Monsignor Donovan High Sch.*,
    420 F. Supp. 2d 337 (D.N.J. 2006) ......................................................................... 28

*Ali v. Woodbridge Twp. Sch. Dist.*,
    957 F.3d 174 (3d Cir. 2020)................................................................................... 13

*Alianza Dominicana, Inc. v. Luna*,
    645 N.Y.S.2d 28 (App. Div. 1996) ......................................................................... 13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................ 10

*Bishop v. Okidata, Inc.*,
    864 F. Supp. 416 (D.N.J. 1994) ............................................................................. 28

*Buckley v. Trenton Sav. Fund Soc'y.*,
    111 N.J. 355 (1988) ................................................................................................ 26

*Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*,
    654 F. App'x 80 (3d Cir. 2016) .............................................................................. 17

*Corson v. Accounts Receivable Mgmt.*,
    No. 13-01903 (JEI/AMD), 2013 U.S. Dist. LEXIS 112282, (D.N.J. Aug. 8, 2013)............... 25

*Curtis Publ'g. Co. v. Butts*,
    388 U.S. 130 (1967)............................................................................................... 19

*DeAngelis v. Hill*,
    180 N.J. 1 (2004) ........................................................................................... 10, 11

*Dole v. Arco Cherm. Co.*,
    921 F.2d 484 (3d Cir. 1990)................................................................................... 29

*Eastwood v. Nat'l Enquirer*,
    123 F.3d 1249 (9th Cir. 1997) ............................................................................... 20

*Fanelle v. LoJack Corp.*,
    79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) .............................................................. 26

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)............................................................................................... 19

*Greczyn v. Colgate-Palmolive*,
    183 N.J. 5 n.3 (2005) ............................................................................................. 28

*Hennessey v. Coastal Eagle Point Oil Co.*,
   129 N.J. 81, 609 A.2d 11 (1992)..........................................................................24

*Herman v. Ibtihaj Muhammad*,
   No. A-1328-23, 2024 N.J. Super. Unpub. LEXIS 2416,
   (App. Div. Oct. 15, 2024) ...........................................................................18, 23

*Karnell v. Campbell*,
   206 N.J. Super. 81 (App. Div. 1985) ...................................................................10

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991)...............................................................................10

*Lascurain v. City of Newark*,
   349 N.J. Super. 251 (App. Div. 2002) .................................................................26

*Leang v. Jersey City Bd. of Ed.*,
   198 N.J. 557 (2009) ......................................................................................11, 15

*LY Berditchev Corp. v. ESupplements, LLC*,
   No. 2:24-cv-00625 (WJM), 2024 U.S. Dist. LEXIS 165092, (D.N.J. Sep. 12, 2024) ............28

*Mangan v. Corp. Synergies Grp., Inc.*,
   834 F. Supp. 2d 199 (D.N.J. 2011) .....................................................................12

*McCafferty v. Newsweek Media Grp., Ltd.*,
   955 F.3d 352 (3d Cir. 2020).................................................................15, 20, 22

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990)...........................................................................................2, 13

*Moriarty v. Classic Auto Grp., Inc.*,
   Civil Action No. 13-5222 (JBS/AMD), 2014 U.S. Dist. LEXIS 79408,
   (D.N.J. June 11, 2014) .........................................................................................20

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964)..............................................................................................19

*Nostrame v. Santiago*,
   213 N.J. 109 (2013) ..............................................................................................29

*Pace v. Baker-White*,
   850 F. App'x 827 (3d Cir. 2021) ..........................................................................20

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019)......................................................................21, 23, 24

*Pasquarello v. Murphy*,
   Case No. 21-18806, 2022 WL 1665016, (D.N.J. May 25, 2022) ........................... 10

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)....................................................................................... 10

*Pierce v. Capital Cities Commc'ns, Inc.*,
   576 F.2d 495 (3d Cir. 1978)....................................................................................... 14

*Printing Mart-Morristown v. Sharp Elec. Corp.*,
   116 N.J. 739 (1989) .................................................................................................... 28

*In re Nickelodeon Consumer Privacy Litigation*,
   827 F.3d 262 (3d Cir. 2016)....................................................................................... 24

*Romaine v. Kallinger*,
   109 N.J. 282 (1988) .................................................................................................... 26

*Salzano v. N. Jersey Media Grp. Inc.*,
   201 N.J. 500 (2010) .................................................................................................... 11

*Schachtel v. Hughes*,
   Nos. A-3510-21, A-3728-21, 2024 N.J. Super. Unpub. LEXIS 2609,
   (App. Div. Oct. 25, 2024) ................................................................................ 2, 19, 27

*Senna v. Florimont*,
   196 N.J. 469 (2008) .............................................................................................. 11, 19

*Standridge v. Ramey*,
   221 N.J. Super. 538 (App. Div. 1999) ...................................................................... 20

*Tah v. Glob. Witness Publ'g, Inc.*,
   413 F. Supp. 3d 1 (D.D.C. 2019)............................................................................... 16

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*,
   164 F.3d 186 (3d Cir. 1998).................................................................................. 12, 17

*Turf Lawnmower Repair v. Bergen Record Corp.*,
   139 N.J. 392 (1995) .................................................................................................... 19

*Turner v. Wong*,
   363 N.J. Super. 186 (App. Div. 2003) ...................................................................... 27

*United States v. Gonzalez*,
   905 F.3d 165 (3d Cir. 2018)....................................................................................... 18

*Wang v. N.J. State Police*,
   No. 3:18-cv-11933-BRM-TJB, 2019 U.S. Dist. LEXIS 139809,
   (D.N.J. Aug. 19, 2019) ............................................................................................ 27

*Ward v. Zelikovsky*,
   136 N.J. 516 (1994) ........................................................................ 11, 14, 17, 18

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 10

**Treatises**

1 Law of Defamation §1:21 (2d ed) ............................................................................ 1

Restat. (2nd) of Torts § 652B cmt. d. ........................................................................ 25

Restat. (2nd) of Torts § 652E .................................................................................... 26

## I.    <u>PRELIMINARY STATEMENT</u>[1]

> The protection of reputation has taken on additional gravity since the development of the Internet.  It is now easier to defame another person than at any time in world history, as the Internet makes everyone a potential mass-media publisher.
> *See* 1 Law of Defamation §1:21 (2d ed).

Plaintiffs, Lima Jevremović ("Ms. Jevremović") and Autonomous User Rehabilitation Agent, LLC ("Aura") (collectively "Plaintiffs"), submit this memorandum of law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Verified Fourth Amended Complaint ("Motion").[2]

Defendant Brittany Jeream Courville ("Defendant"), is an ivy league educated New Jersey attorney, turned internet personality (FAC, ¶15). Through her YouTube Channels and Instagram accounts, including, but not limited to, That Surprise Witness TV LLC, Defendant has published over 300 videos amounting to more than 47 hours of defamatory content about Ms. Jevremović, and her start-up, Aura.  Defendants' defamatory statements taken together, are well-choreographed efforts to defame, harass, and dox, Ms. Jevremović.

Defendant now attempts to (mis)use her legal training to eschew liability for her defamatory campaign. She claims to couch her statements as "conspiracy theory," adds qualifiers such as "it appears," "I believe" (all with a wink and a nod, of course) and claims that she uses "satirical, opinion language," all of which, she says, grants her a free pass, regardless of what she actually says or insinuates (Brf. at p. 9). Unfortunately for Defendant, the US Supreme Court has explicitly rejected Defendants' argument: "[it] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or

---

[1] As a preliminary matter, Defendants did not file their Motion in searchable PDF format. As a result, Plaintiff cannot identify or access any videos Defendants referenced by hyperlink. To the extent that any of the videos that Defendants cited to by hyperlink are not included in the Fourth Amended Complaint, those videos are outside the scope of this motion and should not be considered.

[2] For ease of reference, we use the following references to pleadings herein the Fourth Amended Complaint ("FAC"); Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Fourth Amended Complaint ("Brf.").

implicitly, the words 'I think.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990). There is no doubt that Defendants' statements suggested verifiable underlying facts that are false, regardless of how Defendants may package those statements.

Defendant further claims that she gets a free pass because her statements are published across social media forums (Brf., at p. 9), another falsity peddled. "Words do mean something, and they do have consequences" even when they are published on the Internet. *Schachtel v. Hughes*, Nos. A-3510-21, A-3728-21, 2024 N.J. Super. Unpub. LEXIS 2609, at *19 (App. Div. Oct. 25, 2024). Defendants' viewers on the other end of the cable believed her words and her implications as truth. When Defendant called her followers to "make noise," they followed her words and targeted, harassed, doxed, and cyberstalked Ms. Jevremović, her mother, her husband, and her husband's family. (FAC, ¶¶19, 23-25).  When Defendant presented her fabricated stories to her audience, saying they were based on her "education, knowledge, and experience," her viewers believed she was "speaking truth, doing God's work," and that Ms. Jevremović is "[a] criminal," "sounds like another Elizabeth Holmes," "[d]isgusting," "dangerous," "evil," "manipulative," "snake oil salesman with blook on her hands," to name a few. (FAC, ¶¶55, 62, 78, 118, 125). Defendant reinforced her viewers' beliefs and encouraged her viewers to support her statements of facts by affirming and supporting their comments.

As a result of Defendants' wrongful conduct, Ms. Jevremović has lost everything: she has been unable to find consistent employment because any Google Search results are permeated with Defendants' lies; her mother lost her job because Defendant's followers made calls to her mother's employer; and her marriage collapsed under the strain of an unrelenting campaign of harassment. (*Id.*, ¶21, 23-25). Because of Defendant's wrongful acts, Aura, a startup that once received $1.5

million investment and was valued at $10 million, was closed for. (*Id.*, ¶22). Defendants must be held accountable for their wrongful conduct.

## II.    STATEMENTS OF FACTS

### A.    PLAINTIFFS' INVOLVEMENT WITH BAM MARGERA

Celebrity entertainer Bam Margera ("Mr. Margera") and his wife, Nicole Boyd-Margera ("Ms. Boyd-Margera"), took an interest in AURA in the Winter 2020. (FAC, ¶84). Mr. Margera had fought a longtime battle with substance abuse and witnessed numerous members of his inner-circle fight addiction over the previous two decades. (*Id.*). Mr. Margera and Ms. Boyd-Margera initially sought to provide their support to Plaintiffs' efforts to rehabilitate addiction and improve related health outcomes. (*Id.*). When Mr. Margera proved susceptible to multiple relapses in his own battle with addiction, Mr. Margera's family approached Ms. Jevremović for intervention assistance. (*Id.*).

When Mr. Margera's family and friends implored Ms. Jevremović to serve as Mr. Margera's temporary guardian, Ms. Jevremović agreed and took on the responsibility for overseeing Mr. Margera's treatment, which was put into effect by Court Order. (FAC, ¶85). Mr. Margera's father had been assisting Mr. Margera in managing his finances for many years at Mr. Margera's request, and Ms. Jevremović's appointment as a temporary guardian did not touch upon Mr. Margera's money. (*Id.*). On or about June 7, 2021, an Arizona court imposed a one-year temporary guardianship over Mr. Margera in connection with his diagnosed medical issues. (*Id.*). Notwithstanding that Ms. Jevremović was statutorily permitted to collect reasonable sums for her services as *guardian*, Ms. Jevremović was not reimbursed for funds she advanced for Mr. Margera's treatment and legal fees. (*Id.*).

Having no connection to the underlying proceedings, Defendants nevertheless made, suggested, and implied baseless accusations that Mr. Margera's family and Ms. Jevremović

manipulated a court-imposed guardianship to access Mr. Margera's assets, that Ms. Jevremović was committing and assisting in the commission of criminal acts, and that Ms. Jevremović was dishonest and promulgated lies. (*Id.*, at ¶88).

Defendants' fabricated story started with the false statement that Mr. Margera was under a "conservatorship." (*Id.*, at ¶90). On or about February 9, 2022, Defendants published a post, which expressly stated, among other things, that Mr. Margera was under a "conservatorship," and that conservatorship has financial implications, while guardianship has not. (*Id.*, at ¶¶91, 92). Informed of the difference between guardianship and conservatorship, and that Mr. Margera was under a guardianship, Defendant chose to flex her Ivy League legal education to give herself apparent credibility and commented on her own post, among other things:

> Bam margera from jackass is in a conservatorship. His so called friends are erroneously stating that guardianships and conservatorships are not the same thing. The so called friends are mistaken.

(*Id.*, at ¶92). On April 19, 2022, Defendant published an image on Instagram containing a short conversation between herself and a commenter. The commenter accurately stated:

> [Mr. Margera is] not under a conservatorship[;] he's under a guardianship – big difference.

(*Id.*, at ¶96). Defendant, reminding her viewers that she is a lawyer, solicited viewers for her advertisement-supported videos:

> are you a lawyer? Because I am. It's not different. It's exactly the same. Different states just call it different things. Please feel free to check out my Bam Margera playlist on YouTube for more info!

(*Id.*, at ¶97). Defendant's audience viewed her as a credible authority to answer questions on the issues she was discussing. (*Id.*, at ¶¶98, 99).

From June 22, 2022 to June 24, 2022, Defendant published documents that had been filed under seal in the Superior Court of the State of Arizona, County of Maricopa, in the matter captioned "In the Matter of the Guardianship of: BRANDON MARGERA," in no less than five (5) posts, on her Instagram. (*Id.*, at ¶102).

Defendant suggested, insinuated, and implied that Ms. Jevremović was motivated, and was in a position as a "conservator," to control Mr. Margera's assets for her personal benefit. (*Id.*, ¶¶88-155). For example, on April 3, 2022, Defendant published an image on Instagram, which purported to list biographical information about Mr. Margera, including his putative net worth ($20 Million). She commented on the image:

> According to @distractify, [Margera] is worth $20 million. Now who would have an incentive to want to control that money and who would be in a position to do so 😳😳😳 but what do I know I'm just a cOnSpIrAcY tHeOrIsT 😂😂🤪🤪 #FreeBam.

(*Id.*, at ¶111). A commenter on that post stated: "20 million now, soon to be much less, but it'll all be 'legit,'" to which Defendant responded: "but a certain someone will have fresh lips, Botox, and a BBL watch" (*Id.*) and the same commentator responded: "plus a vehicle, home, medical expenses, all necessary in order to fulfil duties." (*Id.*). Defendants did nothing to disabuse the commenters of the conclusion being drawn from Defendants' published image and comments.

Under the post where Defendant stressed that a conservator and a guardian are the same thing, a commenter asked: "forced incarceration, experimenting on homeless & celebrity cash cows to fund her treatment centers? If im [sic] wrong on anything[,] please [let me know.]" (*Id.*, at ¶108). Defendant responded: "I mean… that's my impression, so if you're wrong[,] I am too." Again, it was clear that Defendants' posts were being understood in a certain way and Defendants did nothing to disabuse their viewers of that understanding.

5

Defendant also posted, among other things, "To clarify, I am a licensed attorney who believes @bam__margera's constitutional rights have been violated. Based on my education, knowledge, and experience, he has been set up by a group of criminal co-conspirators for financial purposes not in bams best interest." (*Id.* at ¶114). Defendant further told to her audience that Ms. Jevremović was a "handler[] and trafficker[]," and a "criminal." (*See, e.g.*, FAC, ¶¶121, 124, 127, 144).

One of the classic examples of Defendants' fabrication of Ms. Jevremović's "set up" of Mr. Margera are the statements that Defendant made during her video entitled "What Happened to Bam Margera? EXCLUSIVE POLICE REPORT" (the "Police Report Video"). (FAC, ¶ 132). In that video, Defendant claims that Ms. Jevremović conspired with Steven Timmer and Mr. Margera's aunt, Antoinette Melissa Dompierre a/k/a Aunt Missy, to trick Mr. Margera into flying to Florida as a "setup" for Mr. Margera's arrest at the hotel at which he was staying. (*Id.*). Specifically, Defendant zoomed in on two pictures of Ms. Jevremović, and implied to her audience that, according to the article she was reading, Ms. Jevremović was the female who was reportedly assaulted by Mr. Margera, and who "thinks [Mr. Margera] tore her implant," when the police arrived. (*Id.*, at ¶¶ 132-136). Indeed, the same article reported that the alleged victim was a white woman in her 50s or early 60s. (*Id.*, at ¶138). Ms. Jevremović, who was in her 30s, could not have been the alleged victim. Defendants knew that but created the illusion otherwise to convince their viewers otherwise.

Ms. Jevremović was in the State of Washington when the alleged assault occurred. (FAC, ¶137).

### B.    PLAINTIFFS' INVOLVEMENT WITH AMANDA RABB

Amanda Rabb was an unhoused, drug-addicted, woman residing on Los Angeles' notorious Skid Row. (*See* FAC, ¶31). In or around late July 2020, Ms. Jevremović appeared for an interview on a YouTube Channel, Soft White Underbelly ("SWU"), run by Mark Laita, a commercial photographer. (*Id.*, at ¶10, 28). During that interview, Ms. Jevremović said that she was starting a scholarship program, under which the recipient was to receive one-year of mental health treatment (including detoxification), seven months of in-patient residential care, three months of full-time out-patient treatment while residing at a sober living facility, and two months of job placement training and reduced therapy to gradually integrate back into society as a productive, healthy member, free of charge. (*Id.*, at ¶28).

Ms. Jevremović eventually selected Ms. Rabb as the first recipient of the scholarship, who was, at that time, in jail for assaulting her father, Larry Rabb. (*Id.*, at ¶¶29-32). In or around August 2020, Ms. Jevremović started working with Mr. Rabb and Ms. Rabb's public defender to help Ms. Rabb obtain the treatment she needed for her substance abuse and mental illnesses. (*Id.*, at ¶33). In or around November 2020, the Court granted the petition for Ms. Rabb to receive treatment. (*Id.*, at ¶34). Sadly, on May 9, 2021, Ms. Rabb passed away. (*Id.*, at ¶36).

Defendant took it upon herself to fabricate a story, claiming that Plaintiffs conspired with Ms. Rabb's father and Mr. Laita to put Ms. Rabb in jail. Defendant further falsely claimed that Ms. Jevremović and AURA conducted experimental treatment on Ms. Rabb, against Ms. Rabb's will. And, Defendant falsely claimed that Plaintiffs caused, and then lied about, Ms. Rabb's death. (FAC, ¶39). Defendant published her story through her social media platforms, including, but not limited to, on her YouTube channel, called "Virtual Reality Hell: The Amanda Rabb Story," which was streamed live on July 21, 2022, and is still accessible online, today (the "Virtual Reality

Video"). (*Id.*, at ¶40). That video has been viewed more than 1,475,747 times. The video was published through her YouTube channel: BJ Investigates. Defendant describes her BJ Investigates Channel as follows:

> BJ sets off to uncover the TRUTH behind some of the biggest scandals in History. No matter what that truth may hold…

(*Id.*, at ¶41). In that video, Ms. Courville stated, among other things, that Ms. Jevremović conspired with Mr. Laita and Mr. Rabb to put Ms. Rabb in jail. (*Id.*, at ¶48). In selling that story to her viewers, Defendant first played a short excerpt of one of Ms. Rabb's interviews with Mr. Laita, where Ms. Rabb had stated that her father was a molester. (*Id.*, at ¶44). Then Defendant told her audience that Ms. Jevremović already knew about Ms. Rabb by July, and worked with Mr. Laita, and Mr. Rabb, whom Ms. Rabb called a "molester," to have Ms. Rabb arrested and put in jail. (*Id.*, at ¶¶48, 50, 52, 56). Defendant also stated in another video, among other things, "On Lima's suggestion, Mark Laita said you should call the cops and get her arrested." (*Id.*, at ¶56).[3]

Defendant's viewers believed the "facts that Defendant conveyed, and interpreted Defendant's false statements as the truth." Defendant made defamatory statements, such as Ms. Jevremović fraudulently collected donations on behalf of Ms. Rabb and that Ms. Jevremović used Ms. Rabb as a "experiment," "test subject" "against her will," and a "research object", on various occasions. (*Id.*, at ¶59-61, 64, 70, 74, 77).

Defendant once again touted her background as a lawyer and advised her viewers and listeners that her many false and defamatory statements should be believed because she was making the statements based on her "education, knowledge, and experience." (FAC, ¶173). Defendant's audience trusted her claimed credentials, listened to and believed as true the

---

[3] In addition to setting the tone as "uncover[ing] the TRUTH," Defendant did not wear any "panda ears or bunny ears" and did not put any props like the "sparkly unicorn pinata" in the background of the videos. (*Id.*, at ¶43).

objectively false statements that Defendant made, implied, and suggested, and commented on Defendant's videos and posts, among other things, that "Lima and her company 'AURA' is a SCAM," "[t]his woman is a criminal and con artist," and that Lima is "criminal," "sounds like another Elizabeth Holmes," "[d]isgusting," "dangerous," "evil," "manipulative," *etc.* (FAC, ¶¶55, 62, 78). Defendants did nothing to disburse the commenters of their conclusions.

Defendant chose not to disclose to her audience that Ms. Rabb had stated during that same interview, that Ms. Rabb cleared her father's name (*Id.*, at ¶45), regarded her father as "a great guy," her "best friend," and her "rock" in the video. (*Id.*, at ¶46). Defendant purposely edited the video to leave those parts out because they did not fit into the false narrative she was selling her viewers and followers.

Ms. Jevremović did not know about Ms. Rabb until Ms. Rabb was already in jail. (*Id.*, at ¶49). During the April 19, 2021 interview with Ms. Rabb, that Defendant referenced and cited to in her video, Mr. Laita described to Ms. Rabb and the audience how, and why, he had suggested to Mr. Rabb to put Ms. Rabb in jail. (*Id.*, at ¶57). Indeed, Mr. Laita did not mention Ms. Jevremović, whatsoever, in connection with making the decision to put Ms. Rabb in jail. (*Id.*, at ¶58). In the same interview, Mr. Laita unequivocally said that he recommended Ms. Rabb as the recipient of the scholarship as "the hardest of all" possible candidates. (*Id.*, at ¶53).

Furthermore, Defendant chose not to show to her audience that Ms. Rabb said during her April 19, 2022 interview with Mr. Laita that she had been clean of substance abuse for 10 to 11 months at that time, that the treatment she was receiving "really helped," that Lima "feels like a mom," is "great," and that Ms. Rabb felt "blessed to have Lima." (*Id. at* ¶¶81, 82). Again, Defendant purposely edited the video so those parts were not shown because they did not fit with the false narrative she wanted her viewers and followers to believe.

9

### III.    LEGAL STANDARD

On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, "the defendant has the burden of showing no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). "In deciding a motion to dismiss under Rule 12(b)(6), the Court must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Pasquarello v. Murphy*, Case No. 21-18806, 2022 WL 1665016, at *5 (D.N.J. May 25, 2022) (Quraishi, J.). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. All reasonable inferences must be drawn in Plaintiffs' favor. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

As the Court noted in *Twombly,* "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (citation omitted).

In a defamation case, "[w]hen the language at issue is capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for a jury to decide." *Karnell v. Campbell*, 206 N.J. Super. 81, 888 (App. Div. 1985).

### IV.    LEGAL ARGUMENT

### A.    PLAINTIFFS HAVE ADEQUATELY PLEAD CLAIMS FOR DEFAMATION

To establish a prima facie case of defamation in New Jersey, a plaintiff must show: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *DeAngelis v. Hill*, 180 N.J. 1, 13 (2004). A defamatory statement is one that "harms the

reputation of another such that it lowers the defamed person in the estimation of the community or deters third parties from dealing with that person." *Salzano v. N. Jersey Media Grp. Inc.*, 201 N.J. 500, 512 (2010).

### 1. The First Prong: Defendants Published False and Defamatory Statements Concerning Plaintiffs

"To determine if a statement has a defamatory meaning, a court must consider three factors: '(1) the content, (2) the verifiability, and (3) the context of the challenged statement.'" *Id.* (quoting *DeAngelis v. Hill*, 180 N.J. 1, 14 (2004)).

"Where the language can be interpreted in both a defamatory and nondefamatory manner, the question is one for the jury to decide." *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1083 (3d Cir. 1988).

Courts begin their review to determine whether a statement is susceptible of a defamatory meaning by looking "'to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.'" *Ward v. Zelikovsky*, 136 N.J. 516, 529 (1994).

When considering verifiability, a court must "determine whether the statement is one of fact or opinion." *Id.* A statement is actionable if it "'suggested specific factual assertions that could be proven true or false.'" *Leang v. Jersey City Bd. of Ed.*, 198 N.J. 557, 585 (2009) (quoting *DeAngelis*, 180 N.J. at 14).

As the Court held in its Opinion, dated August 10, 2023 (the "2023 Opinion"), "context is critical in deciphering unactionable opinion versus defamatory speech." (2023 Opinion, p. 12). A defendant's accusation that plaintiff committed a crime, must be considered in context, focusing on "the listener's reasonable interpretation" of the statement. *Leang*, 198 N.J. at 585. Context includes "the identity of the speaker and the targeted audience." *Senna v. Florimont*, 196 N.J. 469, 492–93 (2008).

11

a) <u>Defendants Published False and Defamatory Statements Regarding Plaintiffs' Involvement with Mr. Margera</u>

It cannot be reasonably disputed that Defendants repeatedly published false and defamatory statements about Ms. Jevremović and AURA as related to Mr. Margera. While Plaintiffs' FAC lists examples of false and defamatory statements, for purposes of succinctness, the focus herein is on the falsehoods spread by Defendants about Plaintiffs through the use of #FreeBam. Defendants created a narrative accusing Ms. Jevremović of "set[ting] up" Mr. Margara to be arrested in order to force him into a treatment center (FAC ¶¶141-142), usurping Mr. Margera's assets through a "conservatorship,"[4] using Mr. Margera's assets to get "free lips, Botox, and a BBL watch,"[5] and on numerous occasions referred to Ms. Jevremović as a "handler[]," "trafficker[]," and "criminal." (s*ee e.g.* FAC ¶¶121, 124, 127, 144). *See Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 205 (D.N.J. 2011) (finding statements that plaintiff engaged in "financial improprieties" constituted actionable "statements of mixed opinion" because they implied underlying facts capable of being proven false); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998) ("A defamatory statement need not explicitly name a plaintiff, so long as it was understood to refer to it by at least one third party: '[i]f the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it

---

[4] For example, Defendant posted:

> According to @distractify, [Margera] is worth $20 million. Now who would have an incentive to want to control that money and who would be in a position to do so 😂😂😂 but what do I know I'm just a cOnSpIrAcY tHeOrIsT 😂😂😵😵 #FreeBam.

(FAC, at ¶111).

[5] Defendant responded to her viewers' comment under this post, implying that Ms. Jevremovic would use Mr. Margera's funds to get "fresh lips, Botox, and a BBL watch." (*Id.*, at ¶111).

referred to the plaintiff.'"). Defendants posted content echoing and doubling-down on her false statements about Plaintiffs across 300 videos – more than 47 hours – devoted to Plaintiffs.

"Determining if a statement is one of fact or opinion rests on the concept of verifiability, because if a statement cannot be proven true or false, it cannot be subject to liability." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 183 (3d Cir. 2020). Here, notwithstanding Defendant's efforts to try to thwart accusations of defamation by couching her statements as opinion or as a "conspiracy theorist," each of Defendants' false statements concerning Plaintiffs are verifiable. For example, Defendants could have verified, and chose not to try to verify, whether Ms. Jevremović was appointed as a guardian or as a conservator for Mr. Margera and whether there is a substantive difference between the two based on relevant state laws. Defendants could have verified, and chose not to verify, whether Ms. Jevremović was receiving any payments or distributions, as approved by a Court, through her guardianship of Mr. Margera.

And, of course, couching the defamatory statements in kitschy rhetoric as a "conspiracy theory" with a wink and a nod to her viewers and followers does not render Defendants' defamatory statements not actionably. Indeed, adding disclaimers or cautionary language such as "they say" or "rumor in the streets say," does not make actionable statements non-actionable. *Alianza Dominicana, Inc. v. Luna*, 645 N.Y.S.2d 28, 30 (App. Div. 1996). Similarly, "[s]imply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'" *Milkovich*, 497 U.S. at 19.

Regardless of how Defendant dressed up her statements, there is no doubt that her audience, who have long followed Defendants' posts, live stream, and videos, believed that her statements regarding Plaintiffs were objectively true. *Pierce v. Capital Cities Commc'ns,*

13

*Inc.*, 576 F.2d 495, 502 (3d Cir. 1978) (It is established that a court should not scrutinize simply the literal references of the language in question, but also should weigh the words "together with their context.")  Commenters on Defendants' posts repeatedly accepted Defendants' statements concerning Ms. Jevremović as true. Defendants not only did nothing to disabuse those commenters of their belief, but actually encouraged them to so believe.

Defendants' viewers published numerous comments, expressing their agreement with the falsehoods that Defendants were peddling - that Ms. Jevremović wanted to "control" Mr. Margera's money, that Ms. Jevremović "wants to sink her claws into his parents and manipulate them out of what little he has left," and that Ms. Jevremović was a "snake oil salesman with blood on her hands." (*See* FAC, ¶¶ 116 – 119, 131).  Defendants' viewers believed, as a result of the statements published by Defendants, among other things, that Ms. Jevremović conducted criminal activity, including, but not limited to, stealing money from Mr. Margera, illegally placed Mr. Margera into a treatment center, and "trafficking" Mr. Margera. (FAC ¶¶ 145-152). The reasonable interpretations of Defendants' comments by Defendants' intended audience demonstrate that Defendants' statements are defamatory. *See Ward*, 136 N.J. at 532 ("The listener's reasonable interpretation, which will be based in part on the context in which the statement appears, is the proper measure for whether the statement is actionable.").

Under the post where Defendants stressed that a conservator and a guardian is the same thing, a commenter asked: "forced incarceration, experimenting on homeless & celebrity cash cows to fund her treatment centers? If im [sic] wrong on anything[,] please [let me know.]" (*Id.*, at ¶108). Defendant responded: "I mean… that's my impression, so if you're wrong[,] I am too."  The commentator believed Defendant's false statements that Ms. Jevremović and

AURA used Ms. Rabb as a "research object," and that Ms. Jevremović was exploiting Mr. Margera, a celebrity, for money, and Defendant reinforced that belief. *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020) ("For example, calling a district attorney 'the David Duke of Chester County' could be actionable because it implied that he was unlawfully 'abusing his power as the district attorney, an elected office, to further racism.'").

In light of the above, Plaintiffs have more than adequately pled that Defendants published false and defamatory statements.

b)    Defendants Published False and Defamatory Statements Regarding Plaintiffs' Involvement with Ms. Rabb

Plaintiffs' FAC contains numerous allegations relating to Defendants' false statements about Plaintiffs' connection to Ms. Rabb; the treatment Ms. Rabb received from Aura, and Defendants' fabrication of a story whereby Ms. Jevremović somehow conspired with Mr. Laita and Mr. Rabb to have Ms. Rabb put in jail, among other false statements. (*See, e.g.,* FAC, ¶¶39, 45, 47-52, 56). Contrary to Defendants' assertions, their statements are not protected opinions. *See Leang*, 198 N.J. at 585.

Defendant claimed that Ms. Jevremović and AURA conducted experimental treatment on Ms. Rabb, against Ms. Rabb's will. And, Defendant claimed that Plaintiffs caused, and then lied about, Ms. Rabb's death. (FAC, ¶39). Defendant published her story through her social media platforms, including, but not limited to, the Virtual Reality Video, which is still accessible, today, and has been viewed more than 1,400,000 times. (*Id.*, at ¶40).

In the video, Defendant falsely stated, among other things, that Ms. Jevremović conspired with Mr. Laita and Mr. Rabb to put Ms. Rabb in jail. (*Id.*, at ¶48). In selling that story to her viewers, Defendant first played a short excerpt of one of Ms. Rabb's interviews with Mr. Laita, where Ms. Rabb had stated that her father was a molester. (*Id.*, at ¶44). Then Defendant told her

15

audience that Ms. Jevremović already knew about Ms. Rabb by July and worked with Mr. Laita and Mr. Rabb, whom Ms. Rabb called a "molester," to have Ms. Rabb arrested and put in jail. (*Id.*, at ¶¶48, 50, 52, 56).

Of course, Defendants' false statements were easily verifiable. Ms. Rabb's own statements in the very same video that Defendant showed, contradicted Defendant's baseless accusations that Ms. Jevremović used Ms. Rabb as an "experiment," "test subject" "against her will," and a "research object" without consent, on various occasions. (*Id.*, at ¶59-61, 64, 70, 74, 77). Furthermore, Ms. Rabb has said that the treatment she was receiving "really helped," that Lima "feels like a mom," is "great," and that Ms. Rabb felt "blessed to have Lima." (*Id.* at ¶¶81, 82).

Defendant also stated in another video, among other things, "On Lima's suggestion, Mark Laita said you should call the cops and get her arrested." (*Id.*, at ¶56). Of course, Ms. Jevremović did not know about Ms. Rabb until Ms. Rabb was already in jail. (*Id.*, at ¶49). As a result, it was factually impossible that Ms. Jevremović conspired to put Ms. Rabb in jail.

Defendants' viewers understood Defendants' statements to be the truth, and published their agreement with Defendants' statements. Evidence of how viewers and followers in fact understood a publication is probative of how average readers could understand a publication. *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 11 (D.D.C. 2019) ("a publication must also be read 'in the sense in which it would be understood by the readers to whom it was addressed.'"). Here, Defendants' audience listened to and believed the false objective facts that Defendants presented and implied. More viewers commented under Defendants' videos and posts, among other things, that "Lima and her company 'AURA' is a SCAM;" "[t]his woman is a criminal and con artist;" and that Lima is "criminal;" "sounds like another Elizabeth Holmes;" "[d]isgusting;" "dangerous;" "evil;" "manipulative," *etc.* (FAC, ¶¶55, 62, 78). In other words, the viewers and

followers understood Defendant' statements exactly how Defendants intended them to be understood. Indeed, every time any viewer or follower made similar comments, Defendants did nothing to disabuse the commenters of their understanding. To the contrary, Defendants often supported the comment and emphasized correction of the understanding. As such, Defendants' statements are susceptible of defamatory meanings, given how Defendants' audience understood those statements.  *See Ward*, 136 N.J. at 529.

> c)   Defendants Published False and Defamatory Statements by Implying That Ms. Jevremović Had an OnlyFans Account

In addition to the aforementioned attacks on Plaintiffs, after publishing to her audience that Ms. Jevremović had spent Mr. Margera's money on "fresh lips, Botox, and a BBL watch," and after learning that her viewers believed Ms. Jevremović was a "prostitute," Defendant published a screenshot of an OnlyFans account with the name "Lima Mora." (*See* FAC ¶¶174-177).  Although Defendant did not explicitly mention Ms. Jevremović by name or tell her audience that the picture she posted was a screenshot of an OnlyFans Account, Defendants' audience, based on the context in which the picture was posted, knew Defendant was referring to the person in the screenshot as Ms. Jevremović, and affirmatively commented: "She got an onlyfans." (*See* FAC ¶176).  *Taj Mahal Travel, Inc.,* 164 F.3d at 189 ("A defamatory statement need not explicitly name a plaintiff, so long as it was understood to refer to it by at least one third party…").  "[T]he literal accuracy of separate statements will not render a communication 'true' where . . . the implication of the communication as a whole was false." *Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*, 654 F. App'x 80, 105 (3d Cir. 2016). Thus, "even where the complained-of statements are literally true, if, when viewed <u>in toto</u>, the accurate statements create a false implication, the speaker may be liable for creating a defamatory implication." *Id.* (emphasis in original).

17

Viewed in toto, Defendants intentionally suggested that Ms. Jevremović had an OnlyFans account in an obvious attempt to besmirch Ms. Jevremović's character and reputation. Her audience believed it. (FAC ¶176). Defendants' publication of the screenshot, in the context in which it was published, is defamatory, *per se*. *See Ward*, 136 N.J. at 526 (statements that impute "unchastity of a woman" constitute slander *per se*).

### 2. The Second Prong: Defendants Published Defamatory Statements to Their Audience

It is undisputed that Defendants published numerous false statements about Plaintiffs through the YouTube Channel of "That Surprise Witness" and "BJ Investigates," and the Instagram Account of "That Surprise Witness." (FAC ¶¶41, 42).

Notwithstanding Defendants' suggestion that there is some talismanic social media defense to defamation law, in reality, there is no "internet defense." *United States v. Gonzalez*, 905 F.3d 165, 192 (3d Cir. 2018) (holding that internet posts were both defamatory and integral to crime).

Indeed, New Jersey Courts have recently addressed the increased dissemination of defamatory statements online and the harm those statements have caused. For example, in October 2024, the Appellate Division affirmed the Law Division's denial of a defendant's Motion to Dismiss, and concluded that the plaintiff, a public school teacher, alleged a prima facie case of defamation and false-light invasion based on statements that the defendant posted on his Instagram account. *Herman v. Ibtihaj Muhammad*, No. A-1328-23, 2024 N.J. Super. Unpub. LEXIS 2416, at *12 (App. Div. Oct. 15, 2024).

Around the same time, the Appellate Division affirmed a judgment awarding plaintiffs damage for defamation and intentional infliction of emotional distress in the amount of $664,947.75, where the defendant published negative online reviews of the plaintiffs – an attorney and her law firm – claiming that plaintiff stole her retainer payment for personal use, never

performed work on her case, and was under ethics review. *Schachtel*, 2024 N.J. Super. Unpub. LEXIS 2609, at *2. In entering the judgment, the trial court concluded, and the Appellate Division affirmed, *inter alia*:

> Words do mean something, and they do have consequences; consequences that are palpable, actual, and in this case, debilitating.
>
> The court finds that the harm here was real, that [the defendant's] conduct was real, and that it was reckless and intentional and she caused harm to [the plaintiff].

*Schachtel*, 2024 N.J. Super. Unpub. LEXIS 2609, at *19. Here too, Defendants' words have consequences, consequences that have been and continue to be palpable, actual, and in this case, debilitating.

### 3.    The Third Prong: Plaintiffs Adequately Pled Actual Malice

A threshold issue is whether Plaintiffs' defamation claim is governed by the standard of "actual malice."  The actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern." *Senna v. Florimont*, 196 N.J. 469, 496 (2008) *citing Curtis Publ'g. Co. v. Butts*, 388 U.S. 130, 163-165 (1967) (Warren, C.J., concurring); *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-280 (1964); *Turf Lawnmower Repair v. Bergen Record Corp.*, 139 N.J. 392, 413 (1995).  To establish the applicability of the actual malice standard, *defendant* has the burden to show that the plaintiff is a 'public official,' 'public figure,' or 'limited purpose public figure."   *See N.Y. Times*, 376 U.S. at 279-280; *Curtis Publ'g Co.*, 388 U.S. at 154; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Defendants assert that Plaintiffs are subject to the actual malice standard without even purporting to demonstrate that Plaintiffs are 'public officials,' 'public figures,' or 'limited purpose public figures.'  *Id.* Nevertheless, to the extent that Plaintiffs could possibly be considered 'public

officials,' 'public figures,' or 'limited purpose public figures' an issue that should be decided later and after discovery. Plaintiffs have adequately pled actual malice, at this stage.  Indeed, Plaintiffs only need to allege facts to support an ***inference*** of actual malice, just in case such a finding is ultimately made.  *See Pace v. Baker-White*, 850 F. App'x 827, 831 (3d Cir. 2021); *Moriarty v. Classic Auto Grp., Inc.*, Civil Action No. 13-5222 (JBS/AMD), 2014 U.S. Dist. LEXIS 79408, at *14 (D.N.J. June 11, 2014).  "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions, we try to understand their motives." *Eastwood v. Nat'l Enquirer,* 123 F.3d 1249, 1253 (9th Cir. 1997).  "Actual malice . . . does not connote ill will or improper motivation. Rather, it requires that the [defendant] either know that its [statement] was false or publish it with 'reckless disregard' for its truth." *McCafferty*, 955 F.3d at 359.  "To prove this state of mind, a plaintiff will generally need to depose not only the defendant but aslo any other person who the defendant claims to have been a source of the alleged false information contained in the defamatory statement."  *See Standridge v. Ramey*, 221 N.J. Super. 538, 547-548 (App. Div. 1999).

Here, Plaintiffs have sufficiently demonstrated that Defendants either knew their statements were false or acted with "reckless disregard" for the truth.  By way of illustration:

| **Defendants' Statement(s):** | **Evidence of Actual Malice** |
| --- | --- |
| • Defendants' story that Ms. Jevremović took advantage of her court-appointed role to conduct criminal activities, to conspire for criminal purposes, to get access to and use Mr. Margera's funds. *(See, e.g.*, FAC ¶¶88-89, 108-111, 114, 118-19, 128-30). | • Defendant chose to ignore the critical distinction between conservatorship and guardianship, so that she could deliver to her audience a factually impossible story. Every time she implied to her viewers the there was a link between Mr. Margera's shrinking assets and Ms. Jevremović, or that Ms. Jevremović was benefiting financially through her court-appointed role, Defendant knew her statements were false, or she was acting with reckless disregarded for the truth. (*See* FAC ¶¶91-107). |

20

| Defendants' Statement(s): | Evidence of Actual Malice |
|---|---|
| | • Defendant touted her background as a lawyer who "graduated from an Ivy League law school," spent enormous hours of her times "searching every possible nook and cranny-not only of the internet but of the physical field of reality," managed to get a copy of the documents that were filed under seal with the Superior Court of the State of Arizona, County of Maricopa, and published those documents no less than five times. (*Id.*, at ¶¶173, 181, 102). She touted to her audience that she knew the "stuff" because she "[is] a lawyer," using her degree "for civil rights," and insisted that she did all the research and investigation of the facts. (*Id.*, at ¶147). By her own admission, and considering Defendant's credentials, Defendant knew or should have known the truth – that Ms. Jevremović did not have access to Mr. Margera's assets by her court-appointed role. |
| • In the Police Report Video Defendant implied to her audience, by zooming in on two pictures of Ms. Jevremović, that Ms. Jevremović was at the scene to setup Mr. Margera's arrest, and it was her implant that was allegedly torn apart by Mr. Margera. (FAC, ¶¶132-136). | • Defendants absurdly argue, among other things, that "[t]he article itself leaves open the possibility that the victim of the alleged assault was someone other than the 50-year woman." (Brf., p. 24). However, it was plain from the article that the caller described the alleged victim as a white woman in her 50s or early 60s, and the caller did not specify "which woman" was the victim: the "alleged prostitute" or the "minder."[6] Ms. Jevremović, in her 30s, could not have been the alleged victim. Defendant knew or should have known Ms. Jevremović was neither the "prostitute" nor the "minder." *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019).

• Defendants further claimed that Defendant "casts doubt" by later stating "I don't know if that's even true" in the same video. (Brf., p. 24). However, when Defendant's viewers commented on her Instagram post of an excerpt in which Ms. Jevremović was wearing the same black sweater as in the two pictures that Defendant zoomed in on, expressing their belief that Ms. Jevremović was the person whose implant was torn, Defendant did not correct any of those false statements. Instead, she endorsed the comment of "[s]he must be the |

---

[6] *See* https://pagesix.com/2021/10/13/bam-margera-attacked-woman-while-on-cocaine-911-call-shows/

| Defendants' Statement(s): | Evidence of Actual Malice |
|---|---|
|  | prostitute that got her implant torn," by responding "👌😂😂 the 'minder.'" (FAC ¶142). |
| • Defendant repeatedly stated or otherwise implied that Ms. Jevremović conspired with Mr. Rabb and Mr. Laita to put Ms. Rabb in jail. (FAC, ¶¶38-39, 47-52, 56). | • Defendant intentionally lied about, or at the very least recklessly disregarded, Ms. Rabb's relationship with her father, whom Ms. Rabb regarded as "a great guy," her "best friend," and her "rock"," so that Defendant could persuade her audience that Ms. Jevremović conspired with Mr. Rabb to put Ms. Rabb in jail. (*Id.*, at ¶¶46-47).

• Defendant also knew that Mr. Laita is the one who suggested to Mr. Rabb to put Ms. Rabb in jail. (*Id.,* at ¶57). Mr. Laita said that when Mr. Rabb called one night and asked "what do I do Amanda just assaulted me the police are here," he told Mr. Rabb to put Ms. Rabb in jail. (*See Id.*).

• Furthermore, Defendant intentionally chose not to show to her audience that with Ms. Jevremović's help, Ms. Rabb was clean of substance abuse for 10 to 11 months by April 2022, that Ms. Rabb said that the treatment she was receiving "really helped," that Lima "feels like a mom," is "great," and that Ms. Rabb felt "blessed to have Lima." (*Id.* at ¶¶81, 82).

• Defendant knew the truth, and chose not to show Mr. Laita's and Ms. Rabb's statements to her audience, when she lied that Ms. Jevremović knew about Ms. Rabb before she went to jail, "hand chose[]" Ms. Rabb with the cooperation of Mr. Rabb, "a molester," suggested to Mr. Laita that Ms. Rabb should be arrested, then send Ms. Rabb to "coerced treatment." |

Defendant lied when she made statements about Plaintiffs' involvement with Mr. Margera and she lied when she made statements about Plaintiffs' involvement with Ms. Rabb. "Where the defendant finds internal inconsistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway, the *New York Times* actual malice test can be met." *Schiavone,* 847 F.2d at 1090; *McCafferty 955 F.3d at* 359. *See Herman*,

22

N.J. Super. Unpub. LEXIS 2416, at *16 (affirming that the defendant's failure to "modify her accusations against [Plaintiff]" after learning of the truth from the plaintiff "can be viewed as evidence of her subjective intent in her posts."). Here, Plaintiffs' allegations of actual malice were not merely conclusory. Nor did they perfunctorily parrot the legal test. Rather, Plaintiffs detail facts questioning whether Defendants knew or had serious doubts about the veracity of their accusations of Plaintiffs' involvement with Mr. Margera and Ms. Rabb. *See Id.*, N.J. Super. Unpub. LEXIS 2416 at *15-16.

The Second Circuit's decision in *Palin v. New York Times Co.*, also provides useful guidance for pleading actual malice. 940 F.3d 804 (2d. Cir. 2019). In *Palin*, the Second Circuit concluded that actual malice was adequately pled, in part, because: the speaker of the defamatory statements had a "background as an editor and political advocate provided sufficient evidence to permit a jury to find that he published the editorial with deliberate or reckless disregard for its truth;" and "(2) the drafting and editorial process also permitted an inference of deliberate or reckless falsification[.]" *Id.* at 813. The Second Circuit in *Palin* cautioned that the "[t]he test is whether the complaint is plausible, not whether it is less plausible than an alternate explanation." *Id.* at 815.

Here, Plaintiffs' allegations concerning actual malice are more than plausible. Like the editor who made the defamatory statements in *Palin*, here Defendant touted her background as an Ivy League law graduate who spent an enormous amount of time "searching every possible nook and cranny – not only of the internet but of the physical field of reality." (FAC ¶¶173, 181,102). Defendant emphasized that she knew "stuff" because she "[is] a lawyer," using her degree "for civil rights," and admitted that she did all the research and investigation of the facts. (*Id.*, at ¶¶147,

181). By her own admission, and considering her credentials, she knew or should have known, that her many statements, as detailed above, were false.

Notably, the Second Circuit, in its *Palin* decision, found that "the inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inference to be drawn from the inclusion of the hyperlinked article was for the jury – not the court." *Id*. at 815. It is respectfully submitted that the same is true here.

As set forth above, Defendant chose to ignore the major inconsistencies between her statements and the truth, cherry-picked what she revealed to her audience, and intentionally edited audio and video that would have had revealed the truth, to further deceive her audience. While "actual malice" may not be necessary for Plaintiffs to ultimately prove, surely Plaintiffs have more than sufficiently pled actual malice if it is needed.

### B.  PLAINTIFFS HAVE ADEQUATELY PLED INTRUSION UPON SECLUSION

To state a claim for intrusion upon seclusion, a plaintiff must allege (1) an intentional intrusion, (2) upon the seclusion of another, (3) that is highly offensive to a reasonable person. *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 293 (3d Cir. 2016) (citing *Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 609 A.2d 11, 17 (1992)).

Defendants intentionally released Ms. Jevremović's social security number, which was contained in a court-sealed document, no less than twice.[7] (FAC, ¶¶100, 102, 202). Defendants falsely claimed that Ms. Jevremović published her SSN "on a public docket." (Brf., p. 26). In reality, Ms. Jevremović included her SSN in her Application for Appoint as Guardian for Mr.

---

[7]     https://www.instagram.com/p/CfMCi1dOg51/?img_index=2     (Accessed     January     8,     2025); https://www.instagram.com/p/CfH9HOulAJw/?img_index=2 (Accessed January 8, 2025). The Application for Appointment as Guardian posted by Defendants initially contained Ms. Jevremović's Social Security Number, unredacted. When accessed on October 14, 2024, Ms. Jevremović's SSN was redacted. As such, it is respectfully submitted that Defendants have admitted that posting Ms. Jevremović's SSN is unlawful by later redacting the SSN later.

Margera, which was sealed and "not accessible to the public." (FAC, ¶ 100). Defendants' intentional publication of Ms. Jevremović's SSN, without more, violated *N.J.S.A.* §56:8-164.[8]

There is no doubt that Defendant assisted and encouraged her followers to use the information that she released to harass and torment Ms. Jevremović. Defendant called "that Surprise Army" to "make noise." (FAC ¶19). With the knowledge of and encouragement from Defendant, That Surprise Army had a discord server "that had over 10,000 pieces of information about Ms. Jevremović and everyone she knew, including estimates and timelines of when Ms. Jevremović met certain people and where Ms. Jevremović was located." (*Id.*, at ¶165). As a result, Ms. Jevremović and her family "were forced to relocate their residence, more than once, and were forced to hire a 24-hour security to guard their home," Ms. Jevremović received "death threats and text messages of dead bodies from unknown numbers, strangers showing up uninvited and unannounced at Ms. Jevremović's home, and drones entering and surveilling Ms. Jevremović's property to watch Ms. Jevremović and her family." (*Id.*, at ¶¶ 2, 204). Defendants' conduct, and the conduct of their followers who acted at Defendant's urging, amounts to a course of hounding and harassment that became a substantial burden to Ms. Jevremović's existence. *See Corson v. Accounts Receivable Mgmt.*, No. 13-01903 (JEI/AMD), 2013 U.S. Dist. LEXIS 112282, at *29 (D.N.J. Aug. 8, 2013) (citing Restat. (2nd) of Torts § 652B cmt. d.). As such, Plaintiffs have sufficiently pled intrusion upon seclusion.

### C.    PLAINTIFFS HAVE ADEQUATELY PLED FALSE LIGHT

To state a claim of false light, a plaintiff must allege that (1) the defendant publicized a matter concerning the plaintiff "before the public in a false light"; (2) "the false light in which [the plaintiff] was placed would be highly offensive to a reasonable person"; and (3) the defendant had "knowledge

---

[8] There is a clerical error in ¶203 of FAC, where N.J.S.A. §58:8-164 should be N.J.S.A. §56:8-164.

of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [the plaintiff] would be placed." *Romaine v. Kallinger*, 109 N.J. 282, 294 (1988) (quoting Restat. (2nd) of Torts § 652E). As discussed above, Plaintiffs have adequately pleaded malice with respect to Defendants' deceitful statements. Likewise, and for those same reasons, the false publicity at issue was of a character "highly offensive to a reasonable person." *Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) ("Being falsely labeled a criminal could be highly offensive to a reasonable person . . . ."). As such, Plaintiffs have adequately pled false light.

### D. PLAINTIFFS HAVE ADEQUATELY PLED EMOTIONAL DISTRESS CLAIMS

In order for plaintiff to plead an intentional infliction of emotional distress claim ("IIED") claims, he must show: (1) intentional conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the emotional distress was severe. *Buckley v. Trenton Sav. Fund Soc'y.*, 111 N.J. 355, 366 (1988). A claim of negligent infliction of emotional distress ("NIED") requires a plaintiff to show that the defendant had a duty, the defendant owed the duty toward the plaintiff, and that the defendant breached that duty, proximately causing the plaintiff's injury of genuine and substantial emotional distress. *Lascurain v. City of Newark*, 349 N.J. Super. 251, 277 (App. Div. 2002). Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed. *Id.*

Ms. Jevremović has sufficiently pled her claim for IIED. Over the course of over two years and through the publication of more than 47 hours of allegations and false accusations, Defendants intentionally published fabricated stories to their viewers about Ms. Jevremović's "criminal" conduct, including, but not limited to, cooperating with a "molester" to put Ms. Rabb in jail, so that Ms. Jevremović could use Ms. Rabb as a "research object," and conducted "coerced treatment"

on Ms. Rabb; imposing a conservatorship on Mr. Margera, "s[a]nk her claws into his parents," used Mr. Margera's funds for her personal benefit, and "traffick[ed]" Mr. Margera. (FAC, ¶¶ 77, 131, 121, 124, 149, 153).  Defendant encouraged her viewers to "make noise" and assisted her followers to hound Ms. Jevremović and everyone associated with her. Defendant's persistent and relentless campaign, targeting anyone who has been seen associated with Ms. Jevremović, led to Ms. Jevremović ending her start-up, her future career, her social connections, and ultimately, her marriage. Defendants' conduct rises to the level of "extreme and outrageous." *Schachtel*, 2024 N.J. Super. Unpub. LEXIS 2609, at *25 (affirming that Plaintiff's IIED claim included "distress she suffered as a result of the totality of [the defendant]'s conduct directed at her over the years the two were acquainted," including, without limitation, the online negative reviews and the defendant's court filings.).

As a result of Defendants' wrongful conduct, Ms. Jevremović regularly sees a psychiatrist and a therapist, and was diagnosed with depression in April 2024.  (FAC, ¶214). *See Wang v. N.J. State Police*, No. 3:18-cv-11933-BRM-TJB, 2019 U.S. Dist. LEXIS 139809, at *19 (D.N.J. Aug. 19, 2019) ("New Jersey law . . . requires plaintiffs to assert that they sought treatment for their alleged distress."). Indeed, the emotional distress that Defendants inflicted has exacerbated Ms. Jevremović's physical conditions, including a heart condition. (FAC, ¶¶ 214, 219). *See Turner v. Wong*, 363 N.J. Super. 186, 200 (App. Div. 2003) (The "severe emotional distress" contemplated by the fourth element "must be sufficiently substantial to result in either physical illness or serious psychological sequelae.").

Plaintiffs have also sufficiently pled their NIED claims by alleging, all of the above, as well as that Ms. Jevremović and her family "were forced to relocate their residence, more than once, and were forced to hire a 24-hour security to guard their home," and that Ms. Jevremović

received "death threats and text messages of dead bodies from unknown numbers."(*Id.*, at ¶¶2, 204).

Moreover, "[a]n intentional infliction of emotional distress claim is rarely dismissed on a motion to dismiss." *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 349 (D.N.J. 2006). It is inappropriate to dispose of the claim before discovery can be taken based on the facts alleged. *See Bishop v. Okidata, Inc.*, 864 F. Supp. 416, 428 (D.N.J. 1994).

### E.    PLAINTIFFS HAVE ADEQUATELY PLED TORTIOUS INTERFERENCE CLAIMS

The two Tortious Interference claims in the FAC have been properly included in the FAC because they relate back, and are based on the same facts as alleged in the TAC, in the two Unfair Competition claims pled there. *See Greczyn v. Colgate-Palmolive*, 183 N.J. 5, 17 n.3 (2005). In remedying the defects in the TAC, pursuant to the Court's Opinion dated August 30, 2024, Plaintiffs have re-labeled the Unfair Competition Claim as their Tortious Interference claims primarily based on the facts alleged in the TAC.

A claim for tortious interference requires a plaintiff to allege facts showing:(1) the existence of a contract, or a prospective economic or contractual relationship; (2) defendant interfered intentionally and maliciously with that contract; (3) loss of the prospective gain or breach of contract as a result of the interference; and 4) damages resulting from that interference. *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52 (1989); *LY Berditchev Corp. v. ESupplements, LLC*, No. 2:24-cv-00625 (WJM), 2024 U.S. Dist. LEXIS 165092, at *4-5 (D.N.J. Sep. 12, 2024). In terms of the first element, "[c]ourts in this district have held that a 'claim for tortious interference with contract [may] survive a motion to dismiss where a plaintiff alleges the existence of a contract but does not plead specific facts identifying it.'" *LY Berditchev Corp. at *5*. Here, Plaintiffs sufficiently alleged the existence of contracts, with "the

investors that had already invested in AURA," and a prospective economic or contractual relationship, with "the prospective investors, including those who had provided a Letter of Intent." (*See* FAC, ¶¶226, 232).

As to the second element, "[t]here can be no doubt that inducing another to end a contractual relationship through acts that amount to fraud or defamation would be wrongful." *Nostrame v. Santiago*, 213 N.J. 109, 124 (2013). Here, Defendants published defamatory statements about Ms. Jevremović and Aura, including, but not limited to, that they used homelessness people as "research object," and put them through coerced treatment, and implied to the public and the founder of Aura had an OnlyFans account. As to the Third and Fourth elements, there is no doubt that Aura lost its investors and potential investors as a result of Defendants' wrongful conduct. As such, Plaintiffs have adequately plead the Tortious Interference claims.

### F.    PLAINTIFFS SHOULD BE AFFORDED AN OPPORTUNITY TO AMEND.

Defendants' request to dismiss all claims with prejudice is contrary to the Third Circuit's adoption of a particularly liberal approach in favor of permitting pleading amendments to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Cherm. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). While it is respectfully submitted that, as set forth in detail above, all claims in the FAC have been properly and adequately pled. However, to the extent the Court finds some deficiency in the pleading, the Court should err on the side permitting amendment where the conduct of Defendants is ongoing and the most recent amendment demonstrates the evolving nature of the nucleus of fact in this case. It is respectfully submitted that if Defendants' Motion to Dismiss is granted based on technicalities, Plaintiffs should be afforded an opportunity to cure the technical defects.

## V.    <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Fourth Amended

Complaint necessarily fails, and should be denied in its entirety.

**EPSTEIN OSTROVE, LLC**

By:_____*s/ Elliot D. Ostrove*_____
Elliot D. Ostrove, Esq. (Bar No. 025581997)
EPSTEIN OSTROVE
200 Metroplex Drive, Suite 304
Edison, New Jersey 08817
Telephone: (732) 828-8600
Fax: (732) 828-8601
Email: e.ostrove@epsteinostrove.com

*Attorneys for Plaintiffs* Lima Jevremović
and Autonomous User Rehabilitation Agent,
LLC

Dated: January 21, 2025